29776. SCOTT *v.* TORRANCE.

Decided March 9, 1943. Adhered to on rehearing April 2, 1943.

*E. W. Maynard, S. G. Jones, E. P. Johnston, Musser, Kimber & Huffman, Carlyle Giles,* for plaintiff.

*Hines & Carpenter, Marion Ennis, Harris, Russell, Weaver & Land,* for defendant.

GARDNER, J. A number of students at Georgia Military College, desiring to attend a football game in Tennessee, made arrangements with E. A. Torrance to take them in a school bus. Torrance operated this bus regularly on school days to transport children to and from their schools. On non-school days he frequently used the bus for special trips. On the occasion in point the students did not charter the bus and assume control of it. Torrance merely agreed to transport them at $2 each.

During the progress of the trip, at a place where the roadway was sixteen feet wide and not in first-class shape, a large truck loaded with bales of cotton approached, traveling in the opposite direction at a speed estimated at from fifty to sixty miles per hour. The evidence indicates clearly that the inside wheels of the truck were on or slightly over the center line of the roadway, and that the body of the truck projected over into the lane which the bus was entitled to use. The shoulder of the roadway was in poor condition, dropping off some eight or ten inches. In order to avoid being sideswiped by the truck the driver of the bus, Major Silvey, who had taken the wheel with Torrance's consent, pulled it to the right; the right rear wheel ran off the pavement; the bus careened, ran about ninety feet and turned over, and Ralph Scott, seventeen, one of the students, was killed.

The bus was traveling about thirty-five miles per hour. The truck was in full view of the bus driver for at least one hundred yards before it passed the bus (Torrance testified that he saw it when it was three hundred yards away), and there was no evidence that Silvey slowed before he pulled to the right. The evidence showed that the bus, traveling at the speed stated, could have been stopped within ninety feet. Mrs. Gertrude M. Scott, Ralph's mother, sued Torrance for damages. The verdict was for the defendant. The plaintiff's motion for new trial was overruled and she excepted.

The action was based on the Code, § 105-1307: "A mother  .  .

may recover for the homicide of a child, minor or sui juris, upon whom she . . is dependent, or who contributes to her . . support, unless said child shall leave a wife, husband, or child." Before the plaintiff could be entitled to recover it was necessary for her to show, first, dependency on her son and contribution by him to her support, and, second, that her son's death resulted from a failure of the bus driver to exercise the degree of care it was his duty to exercise. Failure to prove either would require a verdict for the defendant. From the verdict rendered, which was generally for the defendant in ordinary form, it can not be told whether the jury concluded that the plaintiff had failed in her proof as to the first item, or as to the second.

1. The evidence as to dependency and contribution to support was, in substance, as follows: The Scott family consisted of Mr. and Mrs. Scott, Ralph, and one other child, a daughter. Mr. Scott was in business, his personal income being about $6000 a year. For some years Mrs. Scott had been in poor health. From the time Ralph was five years old he had been waiting on his mother and doing odd jobs about the house. He ran errands for his mother when she was confined to her bed, and later, when he grew older, he did such things as washing windows and floors, firing the furnace, and mowing the lawn. He sold papers and magazines. He also mowed lawns for other people and received money for that work. He gave his mother part of the money he made and saved part of the rest. He gave his mother many presents which the evidence details. When he was old enough to enter high school most of those portions of his time which were not required for school duties were devoted to working for his father or helping his mother. He started a savings account in the joint names of his mother and himself. After he was sixteen he drove the car in connection with his father's business, picking up material, and for other purposes.

When he entered the Georgia Military College he gave his mother his bank book which showed a balance to his credit of $194. His mother did not draw any money from this account between the day he entered the college, September 9, and the day of his death, October 4, but she could have drawn on the account had it been necessary. During that interval, twenty-five days, Ralph made no contribution to the family. His mother expected him to return

home for the Christmas holidays, and had he lived to do so he would have contributed his usual services, looking after the furnace, helping his father, and doing the other things he had been accustomed to do when at home. His father paid his fees for entering the college, some $200 for the half term which would have ended at .Christmas. On one occasion, some years previously, Ralph had drawn from his bank account $28 which his mother needed to help pay her doctor's bill. When Ralph worked for his father the latter did not pay him a regular salary but paid him what he thought he earned. His estimated earning capacity during the summer before he was killed, during most of which time he worked for his father, was "possibly $150 per month."

Mr. Scott testified to many of the details which Mrs. Scott had covered in her testimony, and also described the nature of his business and the assistance Ralph had given him. He stated: "I always pay the grocery bill. I also bought her [Mrs. Scott's] clothes. I also paid the house rent. I also provided all the necessities of life that she needed."

In view of the above and other evidence of a similar nature, none of which was contradicted, counsel for the defendant insist that the matter in question became one of law, and that a finding was demanded that Mrs. Scott had not shown that she came within the provisions of the Code, § 105-1307, supra. If we agreed with counsel in this it would of course render it unnecessary to consider any other feature of the case. But we are of the opinion that the contention can not be upheld. A great many cases arising under this section have been before our appellate courts, and in only a few has it been held that the question presented had resolved itself into one of law. In the majority of instances it has been held that the jury should pass on the facts and decide the question under proper instructions of the court. Illustrating, it was held in *Southern Railway Co.* v. *Covenia,* 100 *Ga.* 46 (29 S. E. 219, 40 L. R. A. 253, 62 Am. St. R. 312), that the court would take judicial cognizance of the fact that an infant one year, eight months, and ten days old was incapable of rendering valuable services; while in *Reid* v. *Moyd,* 186 *Ga.* 578 (198 S. E. 703), it was decided that a precocious child, two and one-half years of age would not, as a matter of law, be conclusively presumed to be so incapable. We call attention to the many cases bearing on the general question

which are cited in the latter decision. In *Atlantic Coast Line R. Co.* v. *McDonald,* 135 *Ga.* 635 (7b) (70 S. E. 249), the statement is made: "The fact that the earnings of the child alone might not be sufficient to support himself would not conclusively show that the mother was not dependent on his services." And in *Southern Railway Co.* v. *Riley,* 60 *Ga. App.* 475 (4) (4 S. E. 2d, 54), is the statement: "The mother may still be dependent upon the child for support notwithstanding she may contribute to his support more in value than he contributes to her support." There are many other authorities which clearly indicate that except in unusual cases the decision of the question whether the plaintiff has brought herself within the terms of the Code section should be left to the jury even though the facts presented are not disputed.

*Fuller* v. *Inman,* 10 *Ga. App.* 680 (74 S. E. 287), contains much valuable matter bearing on the general subject. In the opinion, painstakingly prepared by Judge Pottle, the history of the statute under consideration is reviewed and it is shown that it is in derogation of the common law and is to be strictly construed; also, that it was not until the act of 1887 that a parent could recover for the negligent homicide of a child; also, that the statute is "partly punitory and partly compensatory." Judge Pottle, among many other cases, cited *Smith* v. *Hatcher,* 102 *Ga.* 158 (29 S. E. 162), which held that it was essential that the parent should, at the time of the homicide be "to a material extent dependent upon the [child] for a support, and that the child should then be actually contributing thereto." In the *Smith* case it is held that the word "or" in the section, after the word "dependent," must be construed to mean "and." Also, "special attention is called to the use of the verbs 'is' and 'contributes,' in the present tense," and it is stated that the statute does not mean that the parent may recover for the homicide of a child on whom the parent *has been dependent,* or who might, *at some future time,* except for the homicide, contribute to the parent's support.

Counsel stress the point last referred to, and insist that as the evidence shows that Ralph Scott made no contribution to the plaintiff during the twenty-five days which elapsed between his entry into the college and his death, a finding was demanded that Ralph was making no contribution at the latter date, within the meaning of the *Smith* case. Counsel cite *Brawner* v. *Bussell,* 50 *Ga. App.*

843 (179 S. E. 228), from which we quote as follows: "Her [the mother's] right is dependent upon an actual dependency upon the child for support and the actual contribution by the child at the time [of the homicide] to the mother's support. . . Where, although the child, who at the time of his homicide was confined in a hospital or sanitarium under treatment for a mental derangement, may prior thereto have rendered valuable services to the mother and had contributed to her support, but where during the confinement and at the time of the homicide he was not actually contributing to her support, and, notwithstanding his condition was only temporary and that under proper treatment and care he would recover within fifteen days to two months, *which was speculative only* [italics ours], his condition was of uncertain duration, and where on account of his mental condition he, after he had been placed in the hospital, killed himself by cutting his throat . . he at the time of his homicide was not contributing to the mother's support as provided in the Code section, supra." This case had been brought by the mother, and Judge Jenkins, while concurring in the decision that her petition was demurrable, dissented in the companion case which had been brought by the father (*Brawner* v. *Bussell*, 50 *Ga. App.* 840), in which it was held that the petition stated a cause of action. In this dissent Judge Jenkins, after referring to *Smith* v. *Hatcher*, supra, stated: "I am inclined to think, however, that the language used by Judge Lumpkin in that decision was not intended to be construed absolutely literally so as to wholly preclude any and all recovery where a child was not actually contributing to the parent's support at the moment of the homicide. . ." Then, apparently giving a reason why he had concurred in the decision that the mother's petition was demurrable, Judge Jenkins continues: "It appears, however, that in the suit by the mother the son not only was not making contributions to the mother, but was incapable of doing so; and that whether or not he would have recovered from his grave condition of insanity, during which he committed suicide while confined in the defendant's sanitarium, so as to be able to resume his previous contributions, was necessarily a matter of pure speculation."

Considering the two cases together, what Judge Jenkins said in his dissent in the father's case may, so far as its effect goes, be considered almost as if it had appeared as a concurring opinion in the

mother's case. It enables us clearly to distinguish Mrs. Bussell's case from the one at bar. Here, at the time of the homicide, Ralph Scott was not incapable of rendering support to his mother. He was just as capable as ever, and was in a school pursuing a course of study which, it may be assumed, had he lived to complete it, would have made him capable of rendering more valuable contributions to his family than he had ever rendered before. Further, the giving of his bank book to his mother would have authorized a conclusion that he intended his mother to draw on his accumulations during his absence at school if her requirements were such that she would want to do so, and the force of this situation is not diminished by the fact that she did not draw any money from the account during the twenty-five days Ralph continued to live. We decline to extend the ruling in the *Brawner* case beyond the particular facts there presented.

Stress is laid by counsel on the following statement in the *Fuller* case, supra: "It would make no difference how great the earning capacity of the child might be, if he was not actually contributing to his parent's support, the action would fail. A boy of eighteen, attending college and capable of earning a considerable amount of money, but not actually earning a penny, might be wrongfully killed, and in such a case neither the father nor the mother would have a right of action for his tortious homicide under this statute." It is insisted that this statement is exactly applicable to the facts presented by the case at bar. But it is clear that what Judge Pottle here said was argumentative and obiter. The child who had been killed in the *Fuller* case was between six and seven years old. No question applicable to a boy attending college was involved.

The point is also made that Mrs. Scott could not have been dependent on Ralph, within the meaning of the statute, because Mr. Scott was making $6000 per year and was able to furnish, and did furnish, his family with all the necessities for reasonable and comfortable living. The point is a forceful one, and the authorities offered for and against it do not appear to be entirely harmonious. It should be remembered that the statute is partly penal in its scope and partly compensatory. We have quoted above the statement from *Southern Railway Co. v. Riley,* supra: "The mother may still be dependent upon the child for support notwithstanding she may contribute to his support more in value than he contributes to her

support." If that statement be correct, then, to put it baldly, although the mother of that particular child would be better off financially and materially with the child dead than she would be with the child living, she would not, for that reason, be barred of recovery under the Code section. This consideration leads to several lines of thought which, if we pursued them, would unduly lengthen this opinion. Suffice it to say that the statement in the *Fuller* case, supra, "No fixed definite rule can be laid down which would be applicable in all cases, but each case must depend upon its own peculiar facts," is undoubtedly sound.

In the case at bar the evidence showed that Mr. Scott's business was largely involved with government work. It is common knowledge that such a business is frequently unstable, and the income from it may show great changes, up or down, on short notice. There is no evidence that the Scott family felt that it could afford a regular servant. Mrs. Scott testified: "I do not have a cook. I do the cooking except when the children help me. My daughter is going to the university at Akron [the city where they lived] at present. She is in school most of the day. The only help that I have in my home is day help. She helps me with the washing and laundry. She also helps clean up the house. She only helps one day a week." $6000 per year may be no great income for a family of four which embraces a mother with heart trouble, often confined to her bed, and two children whose education expenses are probably at their height. It will not do to hold, under the particular facts before us, that because Mr. Scott was making $6000 per year, had obligated himself to pay some hundreds of dollars for Ralph's expenses at the college, contemplated continuing the payment of further similar expenses until Ralph's education should be completed, and that during Ralph's college years his contributions to the family would be far less than his expenses, a verdict for the defendant was demanded on this question of dependency. We quote again from *Fuller* v. *Inman,* supra: "The suggestion made in the argument in the present cast, that unless the child contributes more than he consumes, he can not be said to be, in a legal sense, contributing to his parent's support, is answered by Mr. Chief Justice Bleckley in *Augusta Ry. Co.* v. *Glover,* supra, as follows: 'Members of the same household who live by their common labor and its proceeds have a mutual dependence one upon another. Certainly so

unless it be affirmatively shown that a particular member consumes as much, or more, of the common stock than he contributes to it. Even that would not be a conclusive test, for the services of a child to a mother or of a mother to a child may well be reckoned as contributing substantially to the support of the recipient far beyond any money value which the services may have, and the chief element of dependence may be in respect to personal services of this nature.' The learned Chief Justice further suggested that 'in the case of laboring people some regard must be had to the probability of future dependence of an older member of the family upon younger ones;' that in the natural order of human events old age would overtake the parent; that the child was one of the props and stays which nature had provided; and that when this prop was removed, the law demanded at the hands of the wrongdoer, for the benefit of the parent, the full value of his life." See other cases cited by Judge Pottle in this immediate connection.

Then, too, we should not fail to note that assuming a child is contributing to *support*, in determining whether the parent is dependent, this court could not say as a matter of law that because the father made $6000 the mother was therefore not dependent on the child within the meaning of the statute. (For according to the condition in life, standing, and standards of some families in some localities, $4000 or $2000 or less, the jury might be justified in finding the mother was not dependent on the services of the child; or under the facts of some cases, if the father was earning $8000 or more, a finding that the mother may be dependent on the child may be sustainable.) To fix as a matter of law a particular amount, as a basis, unless it is so extreme one way or the other as to admit of no doubt, would not be in keeping with the intent of the statute. Such would be to straight-jacket every standard of living, and station and condition in life within one narrow limitation, and would thus virtually destroy the "American way of life." We are unwilling to hold that because the evidence proved the father was earning $6000 per annum at the time of the homicide a recovery must be held barred as a matter of law. It is a question of fact for the jury.

Concluding our consideration of this point, it can not be held that because there was no issue as to the facts developed on the question of dependency, the evidence not being in conflict, the issue

itself became one of law. It is clear from the authorities that the words "dependent" and "contributes" in the statute are flexible words and are to be differently interpreted in different sets of facts, and, except in clear and unusual cases, it is for the jury to decide whether a plaintiff has brought herself within the terms of the section when she has concluded her evidence. The rule is similar to the one applicable where an obligation involves the doing of an act within a "reasonable time." In such a case, although there may be no conflict in the evidence, it is always a jury question whether the act was or was not so done, except in extreme cases where, under the facts presented, sensible persons could not differ as to whether a reasonable time had or had not expired.

2. On the second point referred to near the beginning of this opinion, the burden on the plaintiff to show that the negligence of the bus driver was the cause of Ralph Scott's death, a careful reading of the evidence shows that it would have supported a verdict either way. It appears to be clear that if the driver of the truck had kept his vehicle closely within his own lane the catastrophe would not have occurred, and that his failure to do so was negligence; but on the other hand the truck was in clear view of Silvey for at least one hundred yards, and if by the exercise of due care he could have avoided the consequences of the other driver's negligence after it was apparent, the defendant would not be excused. This was a jury question. Also, there was presented the rule applicable to exercise of judgment in the face of a sudden emergency. It can not be said that the distance between the vehicles when Silvey first saw, or should have seen, that the truck was approaching at excessive speed and was over the center line of the roadway puts this rule out of the case. There are too many things to be considered. In such circumstances it can not be told what a man will think, and it is often equally as difficult to tell what a man should do. These questions were for the jury. It follows from all of the foregoing that it can not be held that the judge should have granted a new trial on the general grounds.

3. Exception is entered to the following instructions to the jury: "If one is confronted with a sudden emergency and does not have sufficient time to decide with certainty the best course to pursue, he is not held to the same accuracy of judgment as would be required of him if he had had time for deliberation. Therefore,

if you reach the conclusion, or believe from all of the facts and circumstances of this case, that the defendant was confronted with a sudden emergency, and you believe he acted as an ordinary prudent man would have acted under similar circumstances, and that he exercised that degree of care that an ordinary prudent man would have exercised under such circumstances, then you would not be authorized to find against the defendant."

Elsewhere in the charge, at more than one point, the judge instructed that the rule applicable to the case was that of extraordinary care and diligence, and it is contended that that was the correct rule; that the charge above quoted did not state a correct principle and was confusing; also that it put a heavier burden on the plaintiff than the law required. We are of the opinion that these contentions are well founded. It is true that when one is confronted with a sudden emergency he is not "held to the same accuracy of judgment as would be required of him if he had had time for deliberation," but where one had on him the duty to exercise extraordinary care it was incorrect to instruct that he would be relieved from responsibility if he "acted as an ordinarily prudent man would have acted under similar circumstances" when confronted with an emergency. The case was a very close one on its facts, and by the instruction given the jury might easily have been misled to the harm of the plaintiff.

While the status of this bus and its operator was unusual at the time in point, we are of the opinion that, in undertaking to transport the students to the football game in Tennessee, the defendant was a "carrier of passengers" within the meaning of the Code, § 18-204: "A carrier of passengers must exercise extraordinary diligence to protect the lives and persons of his passengers, but is not liable for injuries to them after having used such diligence." Torrance testified: "I operate a school bus for the Baldwin County Board of Education. I have been operating a school bus for them for ten years continuously. I was operating a school bus for them on October 4, 1940 [the day of the accident]. An arrangement was made whereby I was to carry a load of boys to Athens, Tennessee, to a football game. I did go to the Georgia Military College on the morning of October 4. I arrived at the college about 4:30 a. m., and I intended leaving about 5:00 a. m. I did finally get a load." 13 C.J.S. 1033, § 529: "A carrier of passengers is one that un-

dertakes the transportation of persons; a person or corporation who undertakes to transport or convey persons from one place to another, gratuitously or for hire. Such a carrier may be either a special or private carrier, or a public or common carrier." § 530: "To constitute a public conveyance a common carrier, it is not necessary that it come within the definition of a public utility, so as to be subjected to the rules and regulations of a public utility commission." If, on the occasion in point, the students had hired the bus itself, with the right to put into it anybody they chose, employing Torrance to drive them, a different question would be presented. But, taking the evidence as it was presented, we are of the opinion that the school bus, even while being used on one of its special trips, was a "public conveyance" within the meaning of the Code, § 18-201.

As stated above, the evidence showed that on school days Torrance used the bus to transport children to and from the schools, and on those days and as to those children there can be no doubt he was a carrier of passengers. *Sheffield* v. *Lovering,* 51 *Ga. App.* 353 (180 S. E. 523). On non-school days Torrance was open to engagements for special trips. Col. Jenkins, the president of the college, referred to "many trips [they had had] of that nature." Major Silvey stated: "I have been on other trips with Mr. Torrance. I went two trips with him to Savannah and one to Columbus. In making these trips the boys usually selected me to go with them." As to the trip of October 4, the evidence does not show who made the contract for the transportation of the boys. The price charged was $2 each. The capacity of the bus was forty-five, and it carried twenty-five students at the time young Scott was killed. While the bus was primarily for the transportation of children on school days, inasmuch as it was secondarily available on non-school days for special trips it is to be inferred that from these trips the owner derived an additional profit.

We have in the Code a long and exhaustive statute (Code, §§ 68-101 et seq.) regulating motor vehicle transportation and the use of motor vehicles generally, but nowhere in it has any change been made in the rules which prevailed before its passage, and which now prevail, governing the degrees of care required to be exercised by carriers of goods and carriers of passengers. One section of the motor-vehicle statute (Code, § 68-710) reads as follows: "In all

actions against persons, firms or corporations operating busses for hire, for damages done to persons or property, proof of such injury inflicted by the running of busses of such person, firm or corporation, shall be prima facie evidence of want of reasonable skill and care on the part of the servants of the said person, firm or corporation in reference to such injury." This section does not support the contention that the defendant in the case at bar was to be held to the exercise of ordinary care only. It is in almost the exact language of § 94-1108, except that the latter applies to railroads instead of to busses. See also § 18-607. In *Seaboard Air-Line R. Co.* v. *Fountain,* 173 *Ga.* 593 (160 S. E. 789), the court gave a history of § 94-1108, supra, and explained the effect of it. The court adopted the construction by the Supreme Court of Mississippi of a similar statute, the Georgia statute having been taken from that of Mississippi, as follows (page 599) : "In construing the Mississippi statute the Supreme Court of that State held that it was intended to operate only when the facts were not or could not be produced, in which event the burden was upon the company to produce the facts which are, as a general rule, peculiarly within its knowledge; that an instruction upon the principle embraced in this statute ought not to be given where the testimony in the case sufficiently explains every material fact connected with the infliction of the injury; that this statute has served its purpose when it compels the railroad company to explain how the injury occurred; and that the question of negligence or no negligence is to be decided from the facts in the case." In the case at bar, under the evidence produced by the defendant, Code § 68-710 was put out of the case.

We have stated our conclusion that on the trip in point Torrance was a carrier of passengers and charged with the duty to exercise extraordinary care for their safety. When Silvey accepted the position of driver Torrance became responsible for the result of any failure on Silvey's part to exercise extraordinary care. Instead of the charge given, quoted above, the judge should have instructed that the duty of the driver to exercise extraordinary care continued, whether or not the jury believed that he was confronted with a sudden emergency, but that if they should conclude that a sudden emergency did arise, in deciding whether the driver continued to exercise extraordinary care they should take into consideration the

fact that when one is confronted with a sudden emergency he is not to be held to the same accuracy of judgment as would be required of him if he had had time for deliberation.

The fact that the judge elsewhere in his charge emphasized the rule of extraordinary care did not relieve the situation. It has been many times held that a jury is not to be required to select between conflicting instructions, and when two rules are given, the one correct and the other incorrect, and in stating the correct rule the judge does not withdraw or call attention to the incorrect instruction, a new trial should result if the item is important and the circumstances are such that the jury were probably confused or misled to the hurt of the losing party.

Careful consideration of the facts of the case at bar will show the importance of the point under discussion. According to the mathematics of the court, if two vehicles are approaching each other, separated by a distance of one hundred yards, one moving at fifty miles an hour and the other at thirty-five, they will meet in a trifle less than three seconds. Whether the calculation be exact or not, and making due allowance for the probable inexactness of the estimates of distance and of speeds, it is obvious that Silvey, when he saw the truck was occupying a part of his lane, had only an extremely short time within which to act. The situation had all the earmarks of a sudden emergency. Silvey had no time to lose. He had no time to wait and see whether the truck driver would appreciate the danger, as he himself saw it, and give his bus the room it was entitled to have. Almost instantaneous action was required or disaster was inevitable. Torrance testified: "If [Silvey] had stopped the bus or slowed it down [while remaining in his lane] the truck would have hit the bus and probably killed seven or eight of the boys." Yet there was evidence that at the speed the bus was traveling, the slope of its roadway being slightly uphill, the bus could have been stopped within seventy to ninety feet—that is to say, before it would have come opposite the truck it could have been brought to a complete standstill. It follows that the jury would have been authorized to find that there existed time within which its speed could have been appreciably diminished before pulling it out of the lane. And neither Silvey nor Torrance testified that it was slowed at all before Silvey turned it on to the shoulder.

Torrance testified: "I could have stopped the bus within seventy

feet on the pavement if it is traveling thirty or thirty-five miles per hour." And further: "I told Major Silvey to watch that truck. I told him to slow down. He was going thirty-five miles per hour at the time I told him to watch the truck. He was going thirty-five miles per hour at the time he ran off the pavement. I saw that the road was narrow and I saw that the shoulder was sloping. Major Silvey could have seen that the road was narrow and that the shoulder was sloping. I do not know why he did not slow down to ten or fifteen miles per hour when the truck was on his side, knowing that the pavement was narrow and rough and knowing that the shoulder was sloping and narrow and rough." In another part of his testimony he stated that he saw the truck coming over the hill and that it was then about three hundred yards away. Silvey testified: "As the truck got closer to me it continued to take up more than half of the road. In order to cope with the situation I gave him more than half of the road, and I pulled to the right. When I pulled to the right, to give him more than half of the road, it seemed to me that the right rear wheel dropped off of the pavement on to the shoulder of the road and it dropped six or seven inches. And the bus began to swerve down the road on the shoulder of the road. I tried to keep it safe but the shoulder was in such condition that I could not do it. I never could get it back on the pavement. The rear of the bus continued to swerve to the right and in doing so it hit the telephone pole."

As stated above, from the evidence the jury would have been authorized to find that Silvey had time to diminish his speed before pulling off the road but that he pulled over without doing so, and they could have found that the failure to slow before turning was a failure to exercise extraordinary care, giving all due weight to the emergency and the rule applicable thereto.

The crucial question presented was, did Silvey, in doing what he did, exercise the extraordinary care which was required of him, taking into consideration the fact that in view of the emergency he was not to be held to the usual standard of accurate judgment which one, in the exercise of extraordinary care, would be supposed to reach if he had time for deliberation? That question was the one the jury were called on to decide, and in deciding it they should have been aided by an instruction which could not possibly be mis-

understood and which could not be regarded as in conflict with any other instructions.

4. In ground 2 complaint is made of the following instructions: "I further charge you that where the sole, proximate cause of an injury to the son of the plaintiff is the negligence of some other [person] than the defendant or his agent, there can be no recovery against the defendant although the defendant or his agent may have been guilty of negligence. Therefore, if you reach the conclusion that the negligent operation of the cotton truck was the sole proximate cause of the injury to the son of the plaintiff, then you would not be authorized to find against the defendant although you might believe the defendant also was guilty of negligence." And also: "I charge you if you believe that the driver of the approaching truck, and the defendant and his agent, at the time and place complained of, were both guilty of concurring negligence, and that the combined negligence of both was the proximate cause of the death of the deceased boy, I charge you that the plaintiff would be entitled to recover, even though the negligence of the defendant or his agent was small as compared with the negligence of the driver of the truck."

In *Georgia Railway & Power Co.* v. *Bryans,* 35 *Ga. App.* 713 (134 S E. 787), this court ruled: "Where the sole proximate cause of an injury to the plaintiff is the negligence of some one other than the defendant, there can be no recovery against the defendant, although the defendant may have been guilty of negligence." See also *Benton Rapid Express Inc.* v. *Sammons,* 63 *Ga. App.* 23 (10 S. E. 2d, 290). These decisions are controlling on the principle here under discussion, since the facts (particularly in *Georgia Railway & Power Co.* v. *Bryans*) are similar to those herein involved. The first excerpt of the charge of the court as set forth in this ground was not erroneous for any of the reasons assigned, the second excerpt could not have been harmful to plaintiff.

5. In ground 4 (there is no ground numbered 3 in the amendment to the motion) complaint is made of the exclusion of evidence as to Ralph's assistance of his father in the latter's business, and his ambition to take over the business. The testimony quoted in the ground covers two distinct propositions, and the exact effect of the judge's ruling is not quite clear to us. It suffices to say that the details of Ralph's assistance to his father were admissible

as bearing on the contribution he had made in the past to the family and the consequent benefit to his mother which resulted, this benefit having been ended by his death, but evidence as to Ralph's ambitions for the future had no part in the case.

6. Ground 5 is based on the judge's refusal to allow Mr. Scott to answer the following question, the expected answer being stated: "Mr. Scott, now his services to your business, what was that worth to your business per month?" For the reason above indicated the answer should have been received. See *Augusta Railway Co.* v. *Glover,* 92 *Ga.* 132 (6) (18 S. E. 406): "Where father and mother and minor children all reside together and are mutually dependent upon the labor of the family for support, a minor child over fifteen years of age, whose labor or the proceeds of it comes into the common stock, is to be considered as contributing substantially to the support of the mother."

7. Ground 6 complains of the exclusion of statements of a witness for the plaintiff who had been a passenger in the bus at the time of the accident that he had sustained a few bruises, had been paid in full for his injury, and had signed a release. Under *Georgia Railway & Electric Co.* v. *Wallace,* 122 *Ga.* 547 (50 S. E. 478), this testimony was not admissible and the court did not err in so holding. Compare *Hooper* v. *Southern Railway Co.,* 112 *Ga.* 96 (37 S. E. 165); *Clark* v. *Southern Railway Co.,* 20 *Ga. App.* 274 (92 S. E. 1020). This ground is without merit.

8. Ground 7 complains of the admission of a statement of a State trooper concerning a report of the accident he had made to the State Highway Department. Presumably the report contained matter relating to the condition of the shoulder of the road. The witness's statement should have been excluded. Testimony of the trooper as to the condition of the shoulder at the time of the accident would have been admissible, but any information from him as to a report he had made was inadmissible.

9. Ground 8 complains of the court's permitting a question to a witness, "State whether or not if [Silvey] had stayed on the pavement whether or not the cotton truck would have hit him;" and admitting the answer, "I imagine it would have." The ground is without merit. Other evidence to the same effect was admitted without objection.

10. Ground 9 complains of the admission in evidence of testi-

mony of a witness for defendant, who had been a passenger in the bus, that he had put in a claim for property damage and that his father had been paid in full. The judge limited the jury's consideration of the statements to their effect on the credibility of the witness. For the reasons set forth in division 7 of this opinion this evidence was inadmissible. This ground is without merit.

*Judgment reversed. MacIntyre, J., concurs.*

BROYLES, C. J., dissenting. In my opinion the evidence demanded a finding that the plaintiff was not dependent upon her son, Ralph Scott, within the meaning of the statute (Code, § 105-1307); and therefore the court did not err in denying a new trial.